Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Robert W. Gettleman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 02 C 8827 | DATE | Sept. 27, 2004 |
| CASE TITLE | Scott Greenman | v | Caremark, Inc. |

MOTION: [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

DOJune 14, 2004CKET ENTRY:

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Hearing
(5) ☐ Status hearing set for
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
     ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry]

Memorandum opinion and order entered.
Defendant's motion for summary judgment to is granted.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | |
| | No notices required. | | number of notices | |
| X | Notices mailed by judge's staff. | | SEP 2 8 2004 | |
| | Notified counsel by telephone. | | date docketed | 36 |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| | GDS | courtroom deputy's initials | date mailed notice | |
| | | | Date/time received in central Clerk's Office | mailing deputy initials |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SCOTT GREENMAN,            )
                           )
            Plaintiff      )
                           )   No. 02 C 8827
      v.                   )
                           )   Judge Robert W. Gettleman
CAREMARK, INC.,            )
                           )
            Defendant.     )

DOCKETED
SEP 2 8 2004

## MEMORANDUM OPINION AND ORDER

Plaintiff Scott Greenman has sued his former employer, Caremark, Inc., alleging that defendant first subjected him to a hostile work environment because of a disability, retaliated against him for complaining, and ultimately terminated his employment in violation of the Americans with Disabilities Act ("ADA") 42 U.S.C. § 12101 et seq. Defendant has moved for summary judgment on all claims. For the reasons set forth below, defendant's motion is granted.

## FACTS

Plaintiff was employed by defendant in its Information Technology Group ("IT") in its Bannockburn, Illinois facility from August 21, 2000, until his termination in July 2001. He applied for the position of Senior Programmer Analyst, and interviewed with and was hired by Frank Lombardo who was then "Finance Department Manager, IT." During the interview process, plaintiff indicated to defendant that he had a "history of disability" from epilepsy.

Prior to employment with defendant, plaintiff worked for Discover Card Financial Services as a Staff Programmer Analyst and System Programmer from 1995 to May 1998. He was terminated from that position for performance-based reasons. He then sued Discover alleging disability discrimination. Plaintiff then went to work for Unitec, Inc. as a Programmer

Analyst from September 1998 until April 1999, when he was again involuntarily terminated for performance deficiencies. He then sued Unitec alleging disability discrimination.

Despite this history, plaintiff lied on his application to defendant, indicating that he left his previous positions for personal reasons. His resume indicates that he was experienced in various programming languages and techniques, including COBOL, CICS and JCL and COBOL II. Based on these asserted qualifications, Lombardo hired plaintiff for the Senior Programmer Analyst ("SR. PA") position. In that position plaintiff was required to compile programs, work with end users, use data based technologies to incorporate within programs, write COBOL code, write DB2 statements, perform and add JCL statements, execute jobs and meet deadlines.

Plaintiff had performance problems from the start of his employment. Within plaintiff's initial 30 days, Lombardo, who was plaintiff's initial supervisor, noticed serious deficiencies in plaintiff's technical programming skills. Lombardo counseled plaintiff about those deficiencies in plaintiff's introductory review, and gave plaintiff an "unacceptable/does not meet expectations" rating. According to Lombardo, plaintiff did not understand basic computer programming, repeatedly asked for assistance with coding and executing programs and completing assignments, and continuously missed deadlines. Lombardo prepared an improvement plan and provided one-on-one coaching and counseling from himself and other more senior analysts. Despite this help, plaintiff did not successfully complete his initial 90 day introductory period. Lombardo decided to demote plaintiff from Senior SR. PA to PA, rather than terminate plaintiff's employment. Plaintiff does not dispute Lombardo's assessment of his performance and was in agreement with the demotion. Plaintiff was then placed on a second 90 day probationary period for the new position.

In the new position, plaintiff was given increased monitoring and coaching to help him improve his performance level. Soon after the demotion, however, Lombardo discovered that there were even more severe deficiencies in plaintiff's knowledge. Plaintiff was unable to attach a document to an email, even after repeated instructions. He continued to have problems with DB2, JCL, VSAM language, and files and data base commands. Tasks that should have taken minutes took plaintiff days, and tasks that should have taken a day took plaintiff a week.

In February 2001 Lombardo began to prepare plaintiff's annual review. He gave plaintiff a "needs improvement" rating and noted that plaintiff would be placed on a Performance Improvement Plan ("PIP") and would be reviewed after 30 days. Plaintiff rated himself as "needs improvement" and requested more help. Plaintiff was then placed on the PIP.

Lombardo, who plaintiff admits treated him fairly at all times, was transitioning out of the area and was replaced by Christine Skulstad, who was placed in charge of developing plaintiff's PIP based on the specifics in Lombardo's review. Plaintiff alleges that defendant's discrimination began once Skulstad became his supervisor.

When Skulstad took over, she determined that all programmers would be required to perform pager support. Plaintiff informed Skulstad that due to his epilepsy he would be unable to perform night time pager support. He volunteered to work extra day time support instead. This was the first time plaintiff requested any sort of accommodation due to his condition. Plaintiff claims that Skulstad was upset about plaintiff's request, but it is undisputed that after submitting support from his physician, plaintiff was never required to perform night time pager support. Nonetheless, plaintiff argues that from that point on Skulstad became abusive and, by giving him more assignments, made it impossible for plaintiff to work his way off the PIP

Eventually plaintiff requested a transfer. He claims that he was told initially that he could not transfer because he was on a PIP. After stating that it was for medical reasons, defendant requested a doctor's note. Plaintiff provided such a note, which indicated that plaintiff had difficulty with memory and had an inability to function well in a very stressful environment, recommending that plaintiff be transferred to a "less demanding and less stressful work position." In a telephone conversation, plaintiff's doctor indicated that plaintiff would have trouble juggling multiple tasks and that he needed a structured work environment where he would be able to work without interruption in a job requiring rote and routine work.

After much prodding from defendant, plaintiff submitted a list of jobs in which he was interested. These jobs included various programming and management positions. He indicated that he preferred not to take a cut in pay. Plaintiff then meet with defendant's Recruitment Manager to discuss potential positions. The Recruitment Manager then met with Nadine Etienne, Director of Human Resources, to evaluate plaintiff's qualifications and experience, his inability to perform complex and multiple tasks, and the doctor's information concerning plaintiff's medical limitations, against the positions plaintiff had listed. They determined that the positions plaintiff identified did not match plaintiff's education and experience, salary requirements, and medical limitations, particularly plaintiff's problem with multitasking.

Etienne told plaintiff that plaintiff was qualified for an Associates Benefits Administration position ("ABA"), but plaintiff refused, he claims because he was not interested; defendant claims plaintiff refused the ABA because it required a cut in pay. Defendant was unable to identify any other available position for which plaintiff might qualify. Despite plaintiff's continued poor performance, his PIP was kept open for longer than the usual 90 days,

4

giving defendant time to explore a possible transfer. Finally, plaintiff's employment was terminated on July 25, 2001. When informed of the termination, plaintiff then asked if he could be considered for transfer to the ABA position he had rejected previously. That position had, however, already been filled.

## DISCUSSION

In Count I, plaintiff alleges that he was terminated based on a disability. Defendant has moved for summary judgment on Count I, arguing that plaintiff cannot demonstrate that he qualifies for protection under the ADA. Additionally, defendant argues that even if defendant qualifies for protection he cannot establish a prima facie case of discrimination.

To invoke protection under the ADA, plaintiff must establish that he suffered from a disability as defined in the Act. Skorup v. Modern Door Corp., 153 F.3d 512, 514 (7th Cir. 1998). The ADA defines disability as: (a) a physical or mental impairment that substantially limits one or more of the major life activities of an individual; (b) a record of such impairment; or (c) being regarded as having such an impairment. 42 U.S.C. § 12102(2). Equal Employment Opportunity Commission regulations interpreting the Act define major life activities to include "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). "Substantially limits" means that the individual is either "unable to perform a major life activity that the average person in the general population can perform," or is "significantly restricted" as to the condition, manner, or duration under which the individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general

population can perform the same major life activity. 29 C.F.R. § 1630.2(j)(1); Sutton v. United Airlines, Inc., 527 U.S. 471, 480 (1999).

In the instant case, plaintiff suffers from epilepsy, undeniably a mental and physical impairment. Although plaintiff has not specifically identified a major life activity that was substantially limited by his condition, based on the citations and argument in his brief, the court assumes that he is asserting that he was substantially limited in working.

Defendant argues that the evidence demonstrates that plaintiff's epilepsy is not sufficiently severe to substantially limit a major life activity. Under Sutton, the court must analyze the effect of plaintiff's epilepsy in its medicated state on plaintiff's ability to work. Id. at 481. Plaintiff had surgery in 1982 and 1999 to help minimize or eliminate the chances of epileptic seizure. At the time of his employment he continued to take medication to control his condition. Plaintiff has not suffered a seizure since prior to his 1999 surgery and had never indicated to anyone at defendant that his disability caused him to be unable to perform his job, at least until he asked for a transfer. He has presented evidence, however, through his doctor's letter, that his condition affects his memory and ability to perform anything more difficult than rote or routine tasks. Thus, plaintiff argues a reasonable jury could conclude that his condition, even in its medicated state, is sufficiently severe to affect his ability to work.

Plaintiff may be correct, but a condition that simply affects ability to work is insufficient to establish a disability. Plaintiff must present some evidence to demonstrate that his impairment prevents or severely restricts his ability to work. Toyota Motor Manufacturing v. Williams, 534 U.S. 184, 196 (2002). To demonstrate that his epilepsy severely restricts his ability to work, plaintiff must present evidence that he was significantly restricted in the ability to perform either

a class of jobs or a broad range of jobs in various classes. Moore v. J.B. Hunt Transp., Inc., 221 F.3d 944, 953 (7th Cir. 2000). Defendant argues that plaintiff has shown, at best, an inability to work with one particular supervisor, and that by seeking a transfer plaintiff demonstrates that he is not restricted from performing a wide spectrum of jobs.

Plaintiff does little to counter this argument. Once again, however, there is evidence in the record to demonstrate that he is unable to perform any job that would require more than rote or routine tasks which, according to plaintiff, effectively bars him from working at any position that requires utilizing multiple tasks. No evidence has been presented to the court, either by plaintiff or defendant, to suggest whether that constitutes a class of jobs or a broad range of jobs in various classes. Thus, whether plaintiff can establish that he has a disability must be determined by the trier of fact.

That does not mean, however, that plaintiff has defeated defendant's motion for summary judgment on Count I. Aside from a disability, to establish a prima facie case of discrimination, plaintiff must also establish that he is qualified to perform the essential functions of the job, with or without reasonable accommodation, and that he suffered and adverse employment action as a result of the discrimination. 42 U.S.C. § 12111(8); Moore, 221 F.3d at 950.

Defendant argues that plaintiff was never qualified either for the position he was originally hired, or the position from which he was ultimately terminated. It is undisputed that within the first 30 days of employment plaintiff exhibited serious core deficiencies in the areas of DB2, COBOL, JCL, multitasking and meeting deadlines. These deficiencies were discovered by Lombardo, who plaintiff admits was always fair and never discriminated. It was Lombardo's reviews that originally caused plaintiff to be placed on the PIP, and plaintiff admits the accuracy

7

and fairness of those reviews. Thus, the evidence suggests that plaintiff was never qualified for the original position.

Plaintiff's attempts to establish his qualifications by emphasizing his resume and past experience is unavailing, since he lied about being terminated from his previous employment for deficiencies similar to those identified by Lombardo. Thus, plaintiff is correct that his "track record speaks for itself," but what it has to say contradicts rather than supports his position.

Nonetheless, on a motion for summary judgment, plaintiff is entitled to the benefit of all doubts. Thus, the court will assume for purposes of this motion that plaintiff's epilepsy was the cause of his failure at defendant and his previous employment. Once plaintiff's doctor indicated that he needed a less stressful job that did not involve multitasking, however, it became clear that only a transfer to a new position could accommodate plaintiff's needs. The Seventh Circuit has held that the ADA may require such a transfer, Gile v. United Airlines, Inc., 95 F.3d 492, 498-99 (7th Cir. 1996), and defendant made every attempt to do so, without much cooperation from plaintiff. Only after repeated requests did plaintiff submit a list of open positions to which he would consider transfer, and most of those positions did not meet the limitations imposed by plaintiff's doctor. Plaintiff undeniably did not possess the qualifications for the others. Defendant suggested the ABA position, but plaintiff rejected it until the day he was terminated, and by then the position had been filled.

There are significant limitations on an employer's potential obligations to reassign an employee with a disability as a reasonable accommodation. For example, defendant was not obligated to provide plaintiff with the accommodations plaintiff requests or prefers, only a reasonable accommodation. Id. Additionally, the ADA requires only that an employer reassign

an employee with a disability to a position for which the employee is otherwise qualified, and then only to a vacant position. Id. Thus, when defendant suggested that plaintiff transfer to the ABA position and plaintiff declined, defendant had fulfilled its duty of reasonable accommodation.[1] Because plaintiff admittedly could not and did not perform the functions of his job, and because he rejected defendant's offer of a reasonable accommodation, he cannot prevail on his claim that his termination was unlawfully discriminatory under the ADA. Accordingly, defendant's motion for summary judgment on Count I is granted.

In Count II, plaintiff alleges that he was subjected to a hostile work environment because of his disability. Both parties acknowledge that the Seventh Circuit has not yet recognized such a claim in the context of the ADA, although this court can discern no reason one would not exist in an appropriate case. See Conley v. Village of Bedford Park, 215 F.3d 703, 712-13 (7th Cir. 2000). Thus, the court of appeals has "assumed the existence of such claims, without expressly deciding whether they are proper, because resolution of that issue had not been necessary." Id. at 713. That is because the actions before the court had not been "significant enough to rise to the level of a hostile environment were that type of claim available." Id.

The instant case is no different. For harassment to approach the level of a hostile work environment, it must be "so severe or pervasive as to alter the conditions of employment and create an abusive working environment." Faragher v. City of Boca Raton, 524 U.S. 775, 786 (1998).

---

[1] Given plaintiff's doctor's limitation that plaintiff be transferred to a less stressful position that required only rote or routine tasks, it was unreasonable for plaintiff to expect to retain his current salary.

9

Plaintiff's claims do not rise to that level. Basically, he complains that he was asked to perform the functions of his job, and that his supervisor acted unprofessionally once plaintiff asked to be excused from pager support. He has presented no evidence of any substantial harassment. Skulstad's telling plaintiff that she was "not his sister" and "not his friend" does not rise to the level of altering the conditions of his employment, and no reasonable person could consider it as such. Accordingly, the court grants defendant's motion for summary judgment on Count II.

Finally, in Count III plaintiff alleges that defendant retaliated against him for engaging in protected activity. To establish this claim, plaintiff must have evidence that he: (1) engaged in protected activity; (2) an adverse employment action occurred; and (3) a causal link exists between the protected activity and the adverse action. Kersting v. Wal-Mart Stores, Inc., 250 F13d 1109, 1110 (7th Cir. 2001).

Plaintiff's claim of retaliation is basically the same as his claim for hostile work environment. He asserts that once he asked to be relieved of night time pager support Skulstad began to mistreat him or act unprofessionally. He never once complained to anyone at defendant that Skulstad was retaliating against him or treating him differently because he had a disability. Moreover, the only actionable adverse employment action that plaintiff suffered was his termination, which this court has already determined to be lawful. Plaintiff attempts to argue that he was denied the right to apply for the ABA job, but he requested transfer to that position only after he was informed that he had been terminated, which was months after he had rejected the position initially. In short, plaintiff has no more evidence of actionable retaliatory conduct than he does of a hostile work environment. Taken in the light most favorable to plaintiff, he has

some evidence of a personality conflict with Skulstad. There is overwhelming evidence, however, that plaintiff could not perform his job, was not qualified for transfer to the positions he requested, and refused to accept the position for which he was qualified. Because he has no claim for retaliation under the ADA, defendant's motion for summary judgment on Count III is granted.

## CONCLUSION

For the reasons set forth above defendant's motion for summary judgment is granted.

**ENTER:** **September 27, 2004**

_____
**Robert W. Gettleman**
**United States District Judge**